In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1853

ISRAEL RUIZ,

*Plaintiff-Appellant,*

*v.*

J.B. PRITZKER, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-07171 — **John Robert Blakey**, *Judge.*

ARGUED FEBRUARY 12, 2025 — DECIDED DECEMBER 23, 2025

Before PRYOR, KOLAR, and MALDONADO, *Circuit Judges.*

KOLAR, *Circuit Judge.* This case arises from Public Act 100-1182, an amendment to the Illinois Unified Code of Corrections that establishes a new parole system for young-adult offenders. The Act provides, in relevant part, that certain individuals imprisoned for first-degree murder that they committed while under the age of 21 may seek parole review after serving 20 or more years of their sentence. *See* 730 ILCS 5/5-

4.5-115(b). But it only applies to individuals sentenced on or after June 1, 2019. *Id.*

Plaintiff Israel Ruiz was convicted of a first-degree murder that he committed when he was 18 years old, and in 2000 was sentenced to 40 years in prison without the possibility of parole. If the Act applied retroactively, Ruiz would be eligible for a parole hearing. He asks us to hold that the Act's nonretroactivity violates the Equal Protection Clause and the Eighth Amendment's prohibition of cruel and unusual punishment. We disagree and affirm the district court's judgment.

## I. Background

Ruiz was born in May 1980. In 1998, he shot and killed a man who was holding a child. An Illinois jury found him guilty of first-degree murder and aggravated discharge of a firearm. In 2000, Ruiz was sentenced to 40 years in prison without the possibility of parole for the murder count and a concurrent 15 years for the aggravated-discharge count.

In 2019, Illinois enacted new legislation expanding parole eligibility for certain individuals sentenced as young adults. *See* Pub. Act 100-1182, § 5, 2018 Ill. Laws 8923, 8938–42 (codified as amended at 730 ILCS 5/5-4.5-115). The legislation's supporters cited the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), which held mandatory sentences of life without parole for offenders under the age of 18 unconstitutional, as a key inspiration for its passage. The Act states:

> A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182) shall be eligible for parole review by the Prisoner Review Board after

> serving 20 years or more of his or her sentence
> or sentences, except for those subject to a term
> of natural life imprisonment under Section 5-8-
> 1 of this Code or any person subject to sentenc-
> ing under subsection (c) of Section 5-4.5-105 of
> this Code, who shall be eligible for parole re-
> view by the Prisoner Review Board after serving
> 40 years or more of his or her sentence or sen-
> tences.

730 ILCS 5/5-4.5-115(b). The Act, by its terms, does not apply to Ruiz because he was sentenced before June 1, 2019.

Ruiz filed a Section 1983 lawsuit against Illinois's governor and various state officials in their official capacities, alleging that the Act's prospective-only application violates his Fourteenth and Eighth Amendment rights. He seeks declaratory and injunctive relief for the Act to be applied to *all* young adults sentenced for offenses they committed while under the age of 21.

In his amended complaint, Ruiz alleges that the Illinois General Assembly passed the Act based on its recognition that young adults do not have "fully formed brains at eighteen or at twenty-one," expanding on the scientific underpinnings of *Miller* and its progeny. He describes expert findings "that an individual's brain maturation is not ordinarily complete until one reaches approximately 25 years of age[.]" In Ruiz's view, because scientific development applies no differently to offenders who were sentenced before or after June 1, 2019, the Act "creates two different parole systems for individuals convicted of similar or identical crimes based solely on the date of their sentencing." Thus, Ruiz alleges that Defendants

violated the Constitution by "enacting, enforcing, and implementing the Act [only] prospectively."

Defendants moved to dismiss under Rule 12(b)(6) for failure to state a claim. The district court granted the motion.[1] It held that Ruiz could not state a Fourteenth Amendment claim based on our rulings in *United States v. Speed*, 656 F.3d 714 (7th Cir. 2011), and *United States v. Sanders*, 909 F.3d 895 (7th Cir. 2018), which rejected equal protection claims based on sentencing-date disparities after intervening changes in criminal legislation. And on the Eighth Amendment claim, the district court ruled that the Act's prospective-only application did not render Ruiz's sentence cruel or unusual. Ruiz now appeals.

## II. Discussion

We review a district court's grant of a motion to dismiss *de novo*. *Word v. City of Chicago*, 946 F.3d 391, 393 (7th Cir. 2020). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Indiana Land Tr. #3082 v. Hammond Redevelopment Comm'n*, 107 F.4th 693, 698 (7th Cir. 2024) (citation omitted). We construe the complaint "in the light most favorable to" Ruiz, accepting all well-pled facts as true and drawing all inferences in his favor. *Id.* at 696.

---

[1] The district court found that the State's governor and attorney general were entitled to sovereign immunity, but the director of the Department of Corrections was not. The Prisoner Review Board chair did not claim sovereign immunity.

Ruiz contends that the district court erred in dismissing his Fourteenth and Eighth Amendment claims. We discuss each claim in turn.

### A. Equal Protection

Ruiz argues that the Act's nonretroactive grant of parole eligibility violates the Fourteenth Amendment's Equal Protection Clause by treating young adults differently based on their sentencing date. "Equal protection of the laws means that all persons similarly situated should be treated alike." *United States v. Nagel*, 559 F.3d 756, 760 (7th Cir. 2009). Ruiz's equal protection claim does not implicate a suspect classification or fundamental right, so it is subject to rational-basis review. *Ostrowski v. Lake County*, 33 F.4th 960, 966 (7th Cir. 2022). This means that Ruiz must show there is no rational relationship between the Act's differential treatment and any conceivably legitimate government purpose. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009) (quoting *Heller v. Doe*, 509 U.S. 312, 320–21 (1993)). At the motion-to-dismiss stage, he must do so by "alleg[ing] facts sufficient to overcome the presumption of rationality that applies to government classifications." *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).

In Ruiz's view, there is no defensibly rational basis for the Act's dividing line. He contends that individuals sentenced before the Act's effective date are no "more dangerous or less capable of reformation" than those sentenced on or after this date. Ultimately, he seeks to compel Defendants to extend the

Act's protections to individuals who would otherwise be covered by its text, regardless of their sentencing date.[2]

Defendants respond by identifying several rational bases for the Act's prospective-only application, including avoiding financial and administrative burdens from additional parole hearings and upholding finality for victims. The district court held that our precedent forecloses Ruiz's claim. We agree.

### 1. Speed *and* Sanders

We have repeatedly held that disparities between those sentenced before and after a criminal statute's effective date do not violate equal protection. In *United States v. Speed*, we held that the disparity in treatment arising from new sentencing legislation was "plainly rational." 656 F.3d at 720. There, the defendant asserted that his mandatory life sentence, imposed before the enactment of the Fair Sentencing Act of 2010, resulted in an arbitrary disparity that violated his equal protection rights. *Id*. at 719–20. Had the *Speed* defendant been sentenced a year later, he would have been sentenced to ten years under the Fair Sentencing Act. *Id.* at 719. Even so, we explained that "discrepancies among persons who committed similar crimes are inescapable whenever Congress raises or lowers the penalties for an offense." *Id*. at 720 (quoting *United States v. Goncalves*, 642 F.3d 245, 253 (1st Cir. 2011)). When the legislature chooses to amend or enact statutes that solely

---

[2] Neither party has discussed whether the Act's limitation to young-adult offenders "sentenced on or after June 1, 2019" is properly severable from the remainder of the Act. *Bell v. Keating*, 697 F.3d 445, 463 (7th Cir. 2012) ("Partial invalidation may not be possible ... if the legislature would not have passed the law without the unconstitutional element[.]" (citation omitted)). We need not address severability, as we conclude that Ruiz's claim fails on the merits.

apply to future offenders, "[s]omeone … will always be left behind to live with the earlier, harsher penalty[.]" *Id*.

Similarly, in *United States v. Sanders*, the defendant contended that it was unconstitutional to apply a federal recidivist enhancement statute to her sentence after a new state law reclassified her prior felony drug conviction as a misdemeanor. 909 F.3d at 900, 905. Like Ruiz, the *Sanders* defendant contended that this application "create[d] two classes"— those convicted before the law was passed and those after— without any legitimate basis for doing so. *Id.* at 905. We rejected that argument, again holding that such distinctions are rational and that discrepancies are "inescapable" when legislatures "raise[] or lower[] the penalties for an offense."[3] *Id.* (quoting *Speed*, 656 F.3d at 720).

Ruiz's arguments do not meaningfully differ from those made (and rejected) in *Speed* and *Sanders*. He initially attempts to distinguish those cases on procedural grounds, noting that both arose at criminal sentencings with the benefit of a more

---

[3] The Illinois Supreme Court has followed similar logic in finding that prospective-only applications of criminal statutes do not violate equal protection. *People v. Richardson*, 2015 IL 118255, ¶ 10 (reaffirming that "neither the fourteenth amendment nor the Illinois Constitution prevents statutes and statutory changes from having a beginning"); *People v. Grant*, 71 Ill. 2d 551, 562 (1978) (upholding a prospective-only sentencing law). We note as well that several districts of the Illinois Appellate Court have applied *Richardson* in foreclosing equal protection challenges to the Act, in cases nearly identical to Ruiz's. *See People v. Profit*, 2023 IL App (1st) 210881, ¶¶ 34–37; *People v. Barry*, 2023 IL App (2d) 220324, ¶¶ 19–24; *People v. Wells*, 2023 IL App (3d) 210292, ¶¶ 29–33, 44; *People v. Lowder*, 2023 IL App (4th) 220315-U, ¶¶ 42–46. While we are certainly not bound by the Illinois courts' interpretation of the federal Constitution, we acknowledge these decisions under principles of comity.

developed fact record. But we have held that the rational-basis test "can often be applied in advance of discovery." *Flying J*, 549 F.3d at 546 (quoting *Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005)). The critical question, rather, is whether the sentencing issues presented in *Speed* and *Sanders* are meaningfully distinct from the issue of parole eligibility presented in this case. Despite Ruiz's best arguments to the contrary, they are not.

### 2.  *Financial and Administrative Burdens*

Ruiz first contests whether the cost and burden of additional parole hearings present a rational basis for applying the Act only prospectively. He argues that it costs Illinois $38,000 to house an inmate for one year, which will amount to $532,000 for the remaining 14 years of his own sentence—dwarfing any potential savings from denying him and others like him a parole hearing. Ruiz also contends that, unlike the potential resentencings at issue in *Speed* and *Sanders*, parole hearings require no judicial resources and do not meaningfully tax the State's resources. For support, Ruiz cites the Supreme Court's observation in *Montgomery v. Louisiana* that "[e]xtending parole eligibility to juvenile offenders does not impose an onerous burden on the States, nor does it disturb the finality of state convictions." 577 U.S. 190, 212 (2016).

Ruiz failed to include this latter allegation in his amended complaint. But it highlights another distinction between his case and the Supreme Court's precedent. In *Montgomery*, the Supreme Court held that *Miller*'s constitutional ban on life without parole for offenders who were under 18 at the time of their crimes should be applied retroactively. *Id*. But *Miller* and *Montgomery* addressed distinct legal issues under the Eighth Amendment, not the Equal Protection Clause. And

their constitutional protections have not been extended to young-adult offenders like Ruiz who committed their crimes at or over the age of 18. As a result, neither case prohibits Illinois from making conceivably rational distinctions based on its interests.

Even if we could entertain the kind of cost-benefit analysis that Ruiz asks us to undertake on rational-basis review, his argument is unavailing. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (legislative choices are "not subject to courtroom fact-finding" and need not be "[]supported by evidence or empirical data"). Parole hearings—whether or not they are "onerous"—are not costless either, and Ruiz's argument presupposes that they will routinely lead to release. *See Montgomery*, 577 U.S. at 212 ("Those prisoners who have shown an inability to reform will continue to serve life sentences."). The State was within its rights to weigh the comparative cost of retroactive parole hearings and rationally conclude that they were not justified. *See Pryor v. Brennan*, 914 F.2d 921, 925 (7th Cir. 1990) (avoiding administrative burden is a legitimate government interest).

### 3. *Finality for Victims*

Ruiz also challenges the rationality of the State's asserted interest in providing victims with finality by applying the Act on a prospective-only basis. He points out that the Act contains specific procedures allowing victims or their families to participate in the parole process. *See* 730 ILCS 5/5-4.5-115(g) (requiring Prisoner Review Board to provide twelve months' advance written notice of parole hearings to victim or their family and offer them the opportunity to make an oral statement and submit information).

This language notwithstanding, the Act's legislative history makes clear that ensuring finality for victims was a central consideration in limiting its retroactive application. Both the Illinois Senate and House of Representatives bill sponsors confirmed to their respective chambers that the Act would not affect any person currently serving time in order to respect victims' concerns. *See* 100th Ill. Gen. Assem., Senate Proceedings, May 31, 2017, at 36 (statement of Sen. Harmon); 100th Ill. Gen. Assem., House Proceedings, Nov. 28, 2018, at 52–53, 61–62 (statement of Rep. Currie).

The legitimacy of ensuring finality for victims is well-established. *Calderon v. Thompson*, 523 U.S. 538, 539 (1998) ("Only with an assurance of real finality can the State execute its moral judgment and can victims of crime move forward knowing the moral judgment will be carried out. Unsettling these expectations inflicts a profound injury to the powerful and legitimate interest in punishing the guilty." (citation omitted)); *see also Wells*, 2023 IL App (3d) 210292, ¶ 43 ("[T]he State has a weighty interest in the finality of … sentences." (citation omitted)). Victim finality alone is sufficient for us to find that the Act is rationally related to the State's legitimate interest.

Because Ruiz has failed to allege facts sufficient to overcome the strong presumption of rationality to which the Act is entitled, we affirm the district court's dismissal of his equal protection claim.

### B. Eighth Amendment

Ruiz also challenges the Act's prospective-only application under the Eighth Amendment. He alleges that excluding him from relief for which he would be eligible if he were

sentenced after June 1, 2019 violates the Constitution's ban on cruel and unusual punishment.

Under "bedrock Eighth Amendment principles," we must evaluate whether punishments are "cruel and unusual" in light of "the evolving standards of decency that mark the progress of a maturing society." *Walton v. Nehls*, 135 F.4th 1070, 1072, 1074 (7th Cir. 2025) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). Ruiz's Eighth Amendment claim turns on the "evolving standards" underlying the Supreme Court's decisions in *Miller* and *Montgomery*. He argues, in essence, that the Act's nonretroactive application cannot be squared with the scientific and societal reckoning on the "diminished culpability" of young offenders embodied in that case line. *Montgomery*, 577 U.S. at 195 (quoting *Miller*, 567 U.S. at 479).

As we have already noted, Ruiz indisputably falls outside the ambit of *Miller* and its progeny. *Miller* applies to "those under the age of 18 at the time of their crimes" who received a sentence of mandatory life without parole. 567 U.S. at 465. Ruiz was 18 years old when he was charged, so he does not meet *Miller*'s criteria under currently applicable caselaw. *See In re Manning*, 24 F.4th 1107, 1109 (6th Cir. 2022) (*Miller*'s "'new rule' unambiguously applies to only those who were *under* 18 at the time of their offense").[4]

---

[4] Ruiz also contends that his 40-year sentence should be considered *de facto* life without parole. *But see Sanders v. Eckstein*, 981 F.3d 637, 642–43 (7th Cir. 2020) (juvenile offender first eligible for release at age 51 did not receive *de facto* life sentence). Ruiz argues that *Sanders* and like cases did not consider "recent studies" on the life expectancy of young-adult offenders in prison, citing an allegation in his complaint that incarcerated youths have an average life expectancy of only 50.6 years. But whether this is true is a question for another case: Ruiz is still over *Miller*'s age cut-

Still, Ruiz argues that the Act's prospective-only application renders his sentence cruel and unusual because it is purely "arbitrary." In support, he invokes Justice Douglas's concurrence in *Furman v. Georgia* to argue that "legislatures [must] write penal laws that are evenhanded, nonselective, and nonarbitrary" under the Eighth (as well as the Fourteenth) Amendments. 408 U.S. 238, 256 (1972) (Douglas, J., concurring). To the extent that the Eighth Amendment incorporates equal protection principles, they are not violated here for the same reasons discussed above: unlike the Black defendants in *Furman*, Ruiz does not contend that the Act bears on any protected status, and the State has advanced ample support that its law is not irrational (let alone arbitrary).

Ruiz also insists that—though he is not entitled to direct relief under *Miller* and *Montgomery*—their teachings still call into question the "penological purposes" served by keeping him imprisoned without the possibility of parole. *Atkins v. Virginia*, 536 U.S. 304, 317 (2002). But his assertion is misplaced. *Atkins* was a death-penalty case in which the Supreme Court found that executing intellectually disabled prisoners violated the Eighth Amendment based in part on a "national consensus" among state legislatures that such punishment was inappropriate. *Id.* at 314–17; *see also Walton*, 135 F.4th at 1075 ("[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." (citation omitted)).

---

off, and even if we did conclude that his sentence is *de facto* life without parole, this would not answer whether the Act—the subject of Ruiz's constitutional challenge—violates the Eighth Amendment.

We cannot definitively conclude that such a "national consensus" exists today on extending *Miller* and *Montgomery*'s protections to young-adult offenders like Ruiz, though we acknowledge that this is a rapidly evolving area of law in the states.[5] While Illinois's passage of Public Act 100-1182 is of a piece with this trend, the General Assembly specifically *declined* to extend the Act's protections to offenders like Ruiz retroactively. We will not supersede that legislature's authority to make these policy judgments in the first instance. *See Jones v. Mississippi*, 593 U.S. 98, 119–20 (2021).

---

[5] In recent years, at least three state supreme courts have found mandatory life sentences without parole for 18- to 20-year-old offenders unconstitutional under their respective state constitutions. *See Matter of Monschke*, 482 P.3d 276, 280 (Wash. 2021) (en banc); *Commonwealth v. Mattis*, 224 N.E.3d 410, 415 (Mass. 2024); *People v. Taylor*, No. 166428, 2025 WL 1085247, at *6 (Mich. Apr. 10, 2025). Many state legislatures have also expanded protections for emerging adult offenders in light of neuroscientific research suggesting that the transition into adulthood is gradual and highly individualized. *See, e.g.*, Act 152, 2025 Haw. Sess. Laws 350–51 (prohibiting life imprisonment without parole for offenders under the age of 21); Conn. Gen. Stat. § 54-125a (broadening parole eligibility for certain offenders under the age of 21); Colo. Rev. Stat. § 17-22.5-403.7 (same); Cal. Penal Code § 3051(a)(1) (same for certain offenders under the age of 26); La. Stat. Ann. § 15:574.4(B)(2)(a) (same for certain offenders under the age of 25); Vt. Stat. Ann. tit. 33, § 5201 (extending juvenile courts' jurisdiction for qualifying crimes to offenders aged 19); H.B. 853, 2025 Md. Laws ch. 96 (permitting certain offenders convicted between ages 18 and 25 to move for sentence reduction); D.C. Code § 24-403.03 (same). Given the implications of these states' changes for "evolving standards of decency" under the federal Constitution, Ruiz is not unreasonable to suggest that "at some point in the not-too-distant future, the [Supreme] Court might revise the *Miller* line of cases," raising the "Eighth Amendment age-line to 22[.]" *Ruiz v. United States*, 990 F.3d 1025, 1040 (7th Cir. 2021) (Wood, J., dissenting). But we will not claim the prerogative to do so ourselves here.

We reiterate that "[a legislature's] amendment to the statutory penalties does not transform the preexisting penalty scheme into a cruel and unusual one." *Speed*, 656 F.3d at 720 (holding that Fair Sentencing Act's passage did not render defendant's mandatory life sentence cruel and unusual); *see also United States v. Blewett*, 746 F.3d 647, 660 (6th Cir. 2013) ("[T]he Eighth Amendment is not a ratchet that makes a harsher system of penalties unconstitutional the moment a more lenient one is (prospectively) adopted, a theory that would have the perverse effect of discouraging lawmakers from *ever* lowering criminal sentences."). Ruiz asks us to broaden the Illinois legislature's selective extension of *Miller*'s protections beyond the constitutional baseline set by the Supreme Court; this we cannot do. Because there is no pathway for Ruiz to state an Eighth Amendment claim under current precedent, we affirm the district court's dismissal.

### III. Conclusion

For the reasons discussed herein, we AFFIRM.